## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| **THOMAS ORZOLEK**, on behalf of himself and all others similarly situated, | Civil Case No.: 2:25-cv-00078 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **ELIGO ENERGY, LLC** and **ELIGO ENERGY OH, LLC**, | |
| Defendants | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................................ 1

PARTIES ......................................................................................................................................... 3

JURISDICTION AND VENUE ..................................................................................................... 6

FACTUAL ALLEGATIONS .......................................................................................................... 7

    A.    THE HISTORY OF DEREGULATION AND CRESS' ROLE IN ENERGY MARKETS .................... 7
    B.    PLAINTIFF TOM ORZOLEK'S DEALINGS WITH ELIGO ......................................................... 13
    C.    ELIGO'S UNAUTHORIZED PRICING PRACTICES ................................................................... 14

CLASS ACTION ALLEGATIONS ............................................................................................. 22

CAUSES OF ACTION .................................................................................................................. 25

COUNT I: BREACH OF CONTRACT ....................................................................................... 25

PRAYER FOR RELIEF ................................................................................................................ 27

JURY DEMAND ........................................................................................................................... 27

Plaintiff Thomas Orzolek ("Plaintiff"), by his attorneys, Goldenberg Schneider, L.P.A., Wittels McInturff Palikovic, and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, brings this proposed class action in his individual capacity, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy OH, LLC (hereinafter "Eligo" or "Defendants") and hereby alleges the following with knowledge as to his own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      This action seeks to redress Eligo's breach of contract that has caused tens of thousands of commercial and residential customers in Ohio, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Eligo is a certified retail energy supplier ("CRES") that competes with local utilities to sell electricity and natural gas in deregulated energy markets across the United States. Eligo plays a middleman role. It buys energy on the wholesale market and resells it to customers with a markup.  It does not produce or deliver the energy it supplies to customers.

3.      Eligo represents in its customer contract that Eligo's variable energy rates "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."  In other words, Eligo's contract represents that customers' rates are "based on" just two identifiable factors: (1) the cost of wholesale energy, and (2) the cost of Renewable Energy Certificates.[1]

---

[1] Renewable Energy Certificates or "RECs" are tradable certificates that represent the environmental benefits of electricity generated from renewable sources by a different party. RECs are tradable commodities that can be bought and sold in the market. CRESs like Eligo buy RECs and pair them with the "brown" energy they purchase at wholesale and then market their energy supply as "100% renewable energy."

Eligo's contract also represents that the variable rate "may" be "periodically adjusted" in accordance with wholesale market conditions.

4.      In reality, Eligo did not provide customers with variable rates based on its wholesale supply and REC costs.  Instead, Eligo used a pricing methodology that charged excessive and varying profit margins with the intent of depriving customers of the benefits of a rate calculated using the contract's two identifiable pricing criteria.  Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates.  Nor does the contract provide Defendants with discretion to pick and choose the weight of the two factors and then apply whatever markup it sees fit.  Yet Eligo's varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment to do the opposite.

5.      Indeed, Eligo has always followed a uniform policy of charging a rate not calculated in accordance with the way described in Eligo's contract. Eligo has also admitted that its variable rates are set using factors that are not listed in Eligo's contract.

6.      As a result of Eligo's breach of contract, tens of thousands of customers have been, and continue to be, fleeced by Eligo out of tens of millions of dollars in exorbitant charges for electricity and natural gas.

7.      Plaintiff and other Eligo customers (the "Class") have been injured by Eligo's breach of contract.  Plaintiff and the Class therefore seek damages, restitution, and declaratory relief for Eligo's breach of contract.

8.      Only through a class action can Eligo's customers remedy its ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's breach of

contract, it makes no financial sense for an individual customer to bring his or her own lawsuit. With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like Eligo honor the terms of their customer contracts.

## PARTIES

9.      Plaintiff Thomas Orzolek resides in Bridgeport, Ohio. Plaintiff enrolled with Eligo in or around September 2018. Eligo charged Mr. Orzolek a fixed rate for electricity from September 2018 until June 2022, after which it began charging a variable rate. Plaintiff cancelled his Eligo account in or around January 2023. Eligo charged Plaintiff excessive and unauthorized variable rates every month he was on Eligo's variable rate plan.

10.      As a result of Eligo's unauthorized conduct, Mr. Orzolek paid more for his home energy supply than he otherwise should have paid.

11.      Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC. On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida. Accordingly, Eligo Energy, LLC is a citizen of Florida.

12.      Defendant Eligo Energy OH, LLC is an Ohio limited liability company with its principal place of business in Chicago, Illinois. On information and belief, Eligo Energy OH, LLC is a wholly owned subsidiary of Eligo Energy, LLC. Accordingly, Eligo Energy OH, LLC is a citizen of Florida.

13.      Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy OH, LLC. Eligo Energy, LLC and Eligo Energy

OH, LLC hold themselves out as a single company—Eligo Energy.[2] Eligo Energy OH, LLC has

no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[3] There is a

unified executive team, and on information and belief they are all employed by Eligo Energy,

LLC. That unified executive team controls all operational and financial aspects of Eligo Energy

OH, LLC. For example, in a separate consumer class action pending against Eligo Energy NY,

LLC in the United States District Court for the Southern District of New York, the New York

LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the

Eligo brand nationally. Defendants have also admitted that attorneys at Eligo Energy, LLC were

responsible for drafting customer communications and customer contracts. Defendant Eligo

Energy OH, LLC's current Controller, Chief Compliance Officer, Executive Chairman, VP of

Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for

their employment by Eligo Energy, LLC. All of these individuals were voluntarily designated by

defense counsel in the S.D.N.Y. action as key players whose ESI will be collected for search in

that matter. Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant

Eligo Energy OH, LLC, take the acts challenged in this lawsuit.

14.    All of the operations and activities related to acquiring and servicing Eligo's

customers (including Eligo's customers in Ohio) are directed and executed by Eligo Energy,

LLC, including marketing and making sales to Ohio consumers, setting the exorbitant variable

rates for those customers, purchasing energy at wholesale, and handling billing and other back-

office activities. Eligo Energy, LLC also owns and operates the computer software and hardware

used to set rates for all Eligo customers, including Eligo's customers in Ohio. Eligo Energy, LLC

---

[2] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story.

[3] *See id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606").

employs the individuals that conducted the activities challenged in this litigation. For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy, LLC's executive team sets pricing strategy for New York customers. Those individuals include Eligo Energy, LLC's CEO, head of Risk team, and CIO.  Eligo Energy NY, LLC's 30(b)(6) witness also testified that he did not know if a separate group of people manage Eligo Energy NY, LLC as opposed to Eligo Energy, LLC, he could not identify documents that list the names or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo Energy NY, LLC.

15.     Eligo Energy, LLC also holds itself out to customers as their supplier of electricity and the contracting entity. Although Plaintiff's contract with Eligo states that the agreement is between Plaintiff and Eligo Energy OH, LLC, Eligo sends Ohio customers like Plaintiff a cover letter enclosing Eligo's contract that bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606

The letter further states that "[i]n the next few days, you will be receiving a notice from [the local utility] of change of your supplier ***to Eligo Energy, LLC***." (Emphasis added). Eligo's cover letter also states that they enclose "a copy of the Terms of Service with Eligo Energy" and are signed "Sincerely, Eligo Energy."

16.     Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy OH, LLC as a separate entity. Rather, it used the corporate entity Eligo Energy OH, LLC interchangeably with itself. For example, invoices for wholesale electricity purchases from the New York Independent System Operator (NYSIO) for Eligo's New York customers were addressed to "Eligo Energy, LLC."  Similarly, invoices from New York electric utility companies (NY State

Electric & Gas Corporation and Rochester Gas & Electric) addressed to "Eligo Energy NY, LLC" were paid from an account controlled by Defendant Eligo Energy, LLC.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

17. This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and at least one Defendant.

### Personal Jurisdiction

18. This Court has General and Specific Personal Jurisdiction over Defendant Eligo Energy OH, LLC because it is an Ohio limited liability company, and it advertises, markets, distributes, and sells energy to Ohio customers, including Plaintiff. This Court has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets, distributes, and sells energy to Ohio customers, including Plaintiff.

### Venue

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Both Defendants are limited liability companies that are deemed to reside in any judicial district in which they are subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this District under § 1391(b)(1).

## FACTUAL ALLEGATIONS

**A.  The History Of Deregulation And CRESs' Role In Energy Markets**

20.     In the 1990s and 2000s, numerous states, including Ohio, deregulated their markets for retail energy. Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay. Deregulation laws in other states are substantially similar.

21.     Since Ohio opened its retail energy markets to competition, millions of Ohio residential and small business customers have switched to a CRES.

22.     CRESs, the new energy suppliers, compete primarily against local utilities. CRESs purchase energy directly or indirectly from the wholesale energy market. CRESs then sell that energy to end-user customers. However, CRESs do not *deliver* energy to customers' homes and businesses, and the overwhelming majority do not produce electricity or extract natural gas. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. CRESs merely buy electricity and natural gas at wholesale and then sell that energy to end-users with a mark-up. Thus, CRESs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or a CRES sets the price for the customer's energy supply. The only value that CRESs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge. Absent such savings, CRESs merely siphon money from end users in the form of increased (and unnecessary) charges.

23.     CRESs are subject to minimal regulation by state utility regulators like the Public Utilities Commission of Ohio ("PUCO"). CRESs are statutorily exempted from the vast

majority of the PUCO's regulations, including those that concern the setting of rates for consumers. Instead, the calculation of a CRES customer's rates are governed by the contract between the CRESs and the customer.

24.     Customers who do not switch to a CRES for their energy supply continue to receive their supply from their local utility. For example, in Ohio, as in many states, the utilities charge energy supply rates that are driven by the wholesale cost of energy and the market conditions that affect that cost—the same costs that CRESs like Eligo incur in Ohio.  Indeed, in Ohio, AEP Ohio's rates are based on its costs and expenses to purchase and serve energy supply to its customers.[4] AEP Ohio's supply rate includes both the wholesale cost of energy purchased on the competitive wholesale supply market (via a competitive auction for 6-months of supply), the cost to transmit that energy to the point of delivery where AEP Ohio acquires the energy from the transmission system, and AEP Ohio's documented overhead attributable to its acquisition of customers' energy supply.[5]

25.     CRESs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices. But CRESs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing

---

[4] AEP Ohio, https://www.aepohio.com/company/about/rates/generation-supply. "For the generation (supply) portion of your bill, a competitive market auction process is used. This is where energy supply companies submit bids in the auction for the ability to supply energy to AEP Ohio customers for a specified time period at the lowest price possible."

[5] AEP Ohio Tariff, https://www.aepohio.com/lib/docs/ratesandtariffs/Ohio/January2025AEPOhioTariffBook.pdf, Sheet No. 450 thru 452 and Ohio Power Company's Electric Security Plan, p. 7, https://aepohiocbp.com/assets/files/ESP%20III%20Application%20(Book%201).PDF: "The Company's proposed ESP [Electric Security Plan] will provide transparency in AEP Ohio's SSO [Standard Service Offer] pricing, through the introduction of a Generation Energy (GENE) rider, a generation Capacity (GENC) rider, a Basic Transmission Cost Rider (BTCR), and an Auction Cost Reconciliation Rider (ACRR), which will give consumers a comparable price that they can use to compare information when determining whether to select an alternative supplier."

energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers, such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price.  The fundamental purpose of deregulation is to allow CRESs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

26.     Because of their increased flexibility, CRESs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the two factors Eligo's contract ties variable rates to.

27.     Instead, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" its wholesale supply and REC costs and then add whatever markup it chooses.

28.     One of deregulation's main unintended consequences has been the proliferation of CRESs like Eligo whose business model is primarily based on taking advantage of customers.

29.     An exhaustive 2024 analysis of 2,022,842 retail electricity offerings in Ohio— from 2014 to 2023—found that between 65% to 73% of competitive retail offers exceeded the utility's default service rate.[6] For the offers that exceeded the default service price, they did so by an average of 26% to 32%, despite providing no benefit to the consumer.[7]

30.     In an interview, the study's primary author reported that "[e]very day we see

---

[6] Dormady et al., *Efficiency and Consumer Welfare under Retail Electricity Deregulation: Analysis of Ohio's Retail Choice Markets*, 6 J. OF CRITICAL INFRASTRUCTURE POLICY e12031, at 1 (2024), https://doi.org/10.1002/jci3.12031.

[7] *Id.*

prices that are three, four, in some cases 500% away from the wholesale price, there's just huge dispersion in these markets . . . [i]magine if Honda tried to sell a Honda Civic[] for $300,000."[8] Unfortunately in Ohio, "some consumers are committing to the $300,000-Honda-Civic of electric rates, because they don't know any better."[9]

31.     The accumulated cost of these pricing practices is staggering—in Ohio's deregulated natural gas sector, "consumers who have chosen a marketer [like Eligo] have spent **$2 billion more** than consumers who chose the standard offer," according to the Ohio Consumers' Counsel.[10]

32.     Worse, the studies' authors found that CRESs' conduct in Ohio has worsened over time; the longer deregulation goes on, the greater CRESs like Eligo overcharge their customers, even during periods where wholesale supply costs are going down:

> Interestingly, we observe a historical trend of increasing magnitudes over time, abrogated of course by the post-Covid, wartime economy carrying over into 2022 and 2023. This indicates that while the retail market continued to develop and expand, and while the wholesale market was backwardated [i.e., lower future price than current price] and declining in price, the propensity of CRES suppliers to offer contracts exceeding the SSO has increased over time. In other words, ***while the wholesale market was delivering year-over-year decreases in prices, CRES suppliers were increasingly offering less competitive products to residential customers***.[11]

33.     Ultimately, the study's authors determined that the explanation for CRESs' consistently high prices lay not in wholesale price inputs or the purchase of renewable energy credits, but in CRESs' continuing exploitation of unsuspecting and vulnerable consumers:

---

[8] "Study reveals flaws in Ohio's retail electricity marketplace", WOSU Public Media (Jan. 27, 2025), https://www.wosu.org/politics-government/2025-01-27/study-reveals-flaws-in-ohios-retail-electricity-marketplace.

[9] *Id.*

[10] *Id.*

[11] Dormady *et al.* at 9 (emphasis added).

Put simply, we argue that the issue is opportunism; CRES suppliers exploit known demand-side shortcomings and information asymetries on the part of consumers . . . [A] more comprehensive understanding of retail electricity markets must also take into account **the high level of misconduct and deception on the part of profit-maximizing retailers**.

. . .

[I]n resale markets of homogenous products, the product cannot be improved upon and can only be resold. Innovation is constrained. It is not as if a retail supplier will innovate by creating a more efficient electron. **The only way in which these resellers can innovate is through finding newer and more crafty ways to engage in price discrimination**. . . . And, because it is costless for retailers to post multiple offers each day, across a range of different prices and contract terms, they can segment consumer populations by degrees of information asymmetry. Here, we find that many CRES suppliers post multiple offers each day, across a range of prices, filing both competitive and uncompetitive offers alike, for the purpose of segmenting their customer populations. **For a CRES supplier, filing competitive offers for well-informed consumers and exploitative offers for others only has upside and no downside**[.][12]

34.     Summarizing their results, the authors concluded that "the end result [of electricity market deregulation] is that consumers see larger markups, inaccessible savings, and commonplace unscrupulous retail sales practices[.]"[13]

35.     Ohio is not the only state where there is overwhelming evidence of consumer harm from CRES practices.  A 2021 analysis by the *Wall Street Journal*, for example, found that "in nearly every state where they operate, retailers have charged more than regulated incumbents."[14] Data from Massachusetts, Connecticut, Illinois, Maine, Maryland, New York,

---

[12] *Id.* at 15 (emphasis added).

[13] *Id.* at 16.

[14] Scott Patterson & Tom McGinty, *Deregulation Aimed to Lower Home-Power Bills. For Many, It Didn't*, WALL ST. J. (Mar. 8, 2021), https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623?page=16.

and Pennsylvania confirm that consumers pay far too much when they sign up with CRESs instead of sticking with their utility companies.[15]

36.     In 2023, both of Massachusetts' two United States Senators and a Massachusetts Member of Congress criticized CRESs, noting that they found it "[e]specially troublesome [that] the Attorney General's Office found that CRESs have targeted vulnerable populations:

- low-income customers in Massachusetts are nearly twice as likely to sign up with CRESs and are charged higher rates than non-low-income customers;

- assuming 600-kilowatt hour per month usage, typical for a Massachusetts household, an average non-low-income customer who signed up with a CRES lost $222 per year while the average low-income customer lost $254 per year;

- low-income customers collectively experienced an annual net loss of more than $20 million due to higher rates and additional monthly fees;

- communities of color, communities with low median incomes, and communities with high percentages of residents lacking English proficiency correlate with higher rates of participation in the individual residential market for electric supply; and

- customers of advanced age who cannot understand the transaction or are particularly vulnerable are targeted and subjected to aggressive sales tactics."[16]

---

[15] Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

[16] Legislators' Letter at 2 (citing MA A.G. Remarks; Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, Massachusetts Attorney General's Office (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download, and *In re Liberty Power Holdings LLC*, Addendum to Proof of Claim Filed by the Commonwealth of Massachusetts, Case No. 21-13797-SMG (Bankr. S.D. Fla.)).

37. In fact, "[f]orty percent of residents in Dorchester and Mattapan, two Boston neighborhoods with a high proportion of low-income residents, are enrolled with one of these suppliers."[17] "Compared to the city's Community Choice Electricity program, residents have paid suppliers as much as $300 extra per month."[18]

38. There is also a growing call for increased civil enforcement. For example, in December 2023 both of Massachusetts' United States Senators and a Massachusetts Member of Congress urged the Federal Trade Commission to begin enforcement actions against CRESs because state regulatory enforcement activity has proven "difficult for state officials," and after ten years of pursuing CRESs the Massachusetts Attorney General's office "has recovered only $19 million—a small fraction of the more than $600 million lost" by Massachusetts customers.[19]

**B.     Plaintiff Tom Orzolek's Dealings With Eligo**

39. In or around August or September 2018, Eligo solicited Plaintiff Orzolek, and he agreed to switch his electricity supplier to Eligo. As part of the enrollment process, Eligo provided Plaintiff with Eligo's standard customer contract.

40. Eligo began supplying electricity to Plaintiff Orzolek's residence and it continued to do so until he cancelled in our around January 2023.

41. Eligo charged Plaintiff a fixed rate from approximately September 2018 to June 2022. Thereafter, Eligo began charging Plaintiff Orzolek a variable rate for electricity. Eligo charged Plaintiff excessive and unauthorized variable rates every month he was on Eligo's

---

[17] Campbell & Wu, n.23 *supra*.

[18] *Id.*

[19] Legislators' Letter at 3 (citing Chris Lisinski, State House News Service, *Mass. leaders eye changes to 'predatory' electric sales tactics*, WBUR (June 6, 2023), https://www.wbur.org/news/2023/06/06/mass-leaders-eye-changes-to-predatory-electric-sales-tactics).

variable rate plan.

**C.  Eligo's Unauthorized Pricing Practices**

42.  In its form contract, Eligo represents that after the expiration of any fixed rate term, variable rates "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."

43.  The variable rate pricing structure outlined in Eligo's contract has two verifiable and documented components: (1) Eligo's cost to procure energy supply at wholesale, and (2) the cost of RECs to offset 100% of the customers' energy usage, which Eligo buys so it can claim to be providing "100% renewable energy."[20]

44.  Any reasonable consumer of gas or electricity delivered from the utility would expect and understand that Eligo's promise that its variable rate would be periodically adjusted to "market conditions" means that adjustments would only be made based on changes in costs in the market from which Eligo procures electricity or natural gas (the wholesale market). After all, the utilities' supply rates are "market-based" rates and they purchase electricity and natural gas in the competitive wholesale market just like Eligo does. And like any commodities broker whose business is to purchase a commodity on a wholesale market and then resell that commodity to customers at a markup, when Eligo promises variable rates "based on" the underlying energy supply and states that those rates may thereafter be periodically adjusted to "market conditions," a reasonable person would understand Eligo to be promising a rate that fluctuates solely based on the wholesale cost of that commodity.

---

[20] Customers that switch to a CRES still consume the exact same energy that is delivered by their local utility. When a CRES customer turns on a light switch or uses a gas range, the energy they are consuming is identical to the energy consumed by a utility customer.

45.     Eligo's contract does not give Eligo discretion to set prices as it sees fit.  Instead, the contract restricts Eligo's rates to rates that are "based on" Eligo's REC and wholesale supply costs.

46.     Neither of the two cost factors identified in Eligo's customer contract explain its exorbitant charges.  For example, the costs Eligo pays for energy on the relevant wholesale market do not account for Eligo's excessive rates. And Eligo's REC costs are minimal.  As detailed below, Eligo's rates far exceed those identifiable costs and were not "based on" those verifiable costs.

47.     Instead, Eligo's rates are explained by its practice of charging the highest feasible rate before too many customers notice their excessive energy bills and quit Eligo.

48.     Eligo is merely a middleman that buys energy at wholesale and resells it at a markup. Eligo's costs to supply customers with energy do not explain its exorbitant charges.  As detailed below, Eligo's variable rates far exceed those identifiable costs and were thus not "based on" Eligo's REC and market supply costs.

49.     Eligo purchases its energy supply on the competitive wholesale market.  For Ohio customers, that market is called the "PJM" and it is one of the world's largest competitive wholesale electricity markets.  PJM Interconnection, LLC operates this market and it manages the buying, setting, and delivery of electricity and coordinates the movement of wholesale electricity in all or part of 13 states (Ohio, Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Pennsylvania, Tennessee, Virginia and West Virginia) and the District of Columbia.

50.     The cost of wholesale energy from the PJM is overwhelmingly the largest cost Eligo incurs. Eligo's supply costs do not explain Eligo's egregiously high variable rates or the

reason its rates are disconnected from changes in wholesale costs. Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent Eligo even documented and itemized such costs when it set customers' monthly variable rates (Eligo did not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs. For example, while Eligo has tens of thousands of customers across the United States, the address on its website and correspondence with customers "201 W Lake St #151, Chicago, IL 60606" is in truth the address of a tiny mailbox in a UPS store that provides "mailbox and postal solutions."

51.     In fact, as shown below, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

52.     Eligo's outrageous rates are a result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup.

**Benchmark One: Wholesale Market Prices And 100% REC Costs.**

53.     A comparison of Eligo's rates to prevailing wholesale market costs plus the cost of RECs for offsetting 100% of Plaintiff's consumption shows that Eligo does not set its variable rates in compliance with its customer contract.

54.     The table below, *see* ¶ 59, identifies (i) the variable rate Eligo charged Plaintiff, (ii) the corresponding wholesale market conditions plus the cost of RECs, and (iii) the differences between Eligo's rates and the rate promised in Eligo's contract.

55. The market prices below are based on the costs that a CRES incurs supplying a retail customer in Plaintiff's utility zone (AEP Ohio) for each billing period. The PJM market prices for electricity include the weighted day-ahead PJM electricity prices in Plaintiff's respective utility zone, ancillary services costs, capacity costs, transmission costs, and various relatively small charges related to purchasing energy at the PJM (the same costs Eligo incurs in the wholesale market to procure electricity for its customers). These charges are tracked by PJM's Market Monitor, the external consultant that independently evaluates the PJM wholesale electricity market.

56. As for REC costs, assuming Eligo purchased RECs to cover 100% of customer usage, the average price Eligo could have paid for such RECs was only 0.4 cents per kWh. To the extent Eligo purchased RECs covering less than 100% of usage, its REC costs would have been lower than 0.4 cents per kWh.

57. That Eligo's rates are so vastly different from PJM market prices plus the costs of 100% RECs demonstrates that Eligo's variable rates do not aligns with Eligo's contract. The PJM market prices also represent the costs and charges that that Eligo and other CRESs incur in procuring energy supply for their retail customers. Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.

58.     The chart below shows a comparison of the variable rates Eligo charged Plaintiff for seven billing periods to a rate that is based on PJM market prices plus 100% RECs:

| Billing Period | Eligo Rate ($/kWh) | PJM Market Prices Plus 100% RECs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/22/22 - 7/22/22 | $0.1890 | $0.1135 | 1.7 | 67% |
| 7/22/22 - 8/22/22 | $0.1890 | $0.1233 | 1.5 | 53% |
| 8/22/22 - 9/21/22 | $0.1890 | $0.1214 | 1.6 | 56% |
| 9/21/22 - 10/20/22 | $0.2105 | $0.0915 | 2.3 | 130% |
| 10/20/22 - 11/18/22 | $0.2072 | $0.0823 | 2.5 | 152% |
| 11/18/22 - 12/21/22 | $0.1990 | $0.0893 | 2.2 | 123% |
| 12/21/22 - 1/24/23 | $0.1990 | $0.0922 | 2.2 | 116% |

59.     The chart above shows that Eligo's variable rates are consistently and substantially higher than a rate based on the formula set forth in Eligo's customer contract.

60.     Eligo's rates charged to Plaintiff were more than 50% higher than the PJM market price plus the cost of 100% RECs to offset Plaintiff's usage in **every billing period**, were more than **_double_** the PJM market prices plus 100% RECs four times out of seven, and were, on average, **_over ninety-nine percent higher_** than the PJM market prices plus 100% RECs.

61.     Eligo also failed to adjust its rates in accordance with PJM market prices plus 100% RECs. For instance, between September 21, 2022 and October 20, 2022, the PJM market price plus 100% RECs was $0.0915, a **_25% decrease_** from the prior period. Eligo's rate for that same period, however, was $0.2105 per kWh, an **_11% increase_** from its rate during the prior period. During the next period, the PJM market price plus 100% RECs decreased by another **_11%_**, but Eligo's rate remained almost exactly the same (it decreased by 1.5%)—and

outrageously high—at \$0.2072/kWh, over ***150% higher*** than the PJM market price plus the cost of 100% RECs.

62.     That Eligo's rates do not track the PJM market prices is further proof that Eligo is not following its contractual commitment to its customers and is instead levying an excessive and unreasonable fluctuating margin.

63.     Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that a CRES will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to the factors outlined in its contract but are instead outrageously higher.

### *Benchmark Two: The Local Utility's Contemporaneous Supply Rate*

64.     A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo's variable rates are not "based on" Eligo's REC and wholesale supply costs.  Wholesale supply costs drive the local utility AEP Ohio's contemporaneous supply rate.

65.     Publicly available data on the local utilities' rates, like AEP Ohio, which is the utility serving Plaintiff's home, serve as an ideal indicator a price that is "based on" the factors identified in Eligo's contract. This is because the utilities' energy procurement costs are the same costs CRESs like Eligo incur and the utility's rate serves as a pure passthrough of those costs. Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which is what Eligo also does.  Consequently, local utilities' supply rates are the ideal comparator for determining (at the pleading stage) whether Eligo's variable rates are actually "based on" Eligo's REC and

wholesale supply costs (as opposed to charging unsuspecting customers the highest possible price that will not produce unsustainable levels of customer attrition).

66.     In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate. Using the utility's rates as a benchmark for Eligo's rates shows that Eligo's rates were driven by excessive mark-ups and profiteering.

67.     The following table compares Plaintiff's variable supply rates from Eligo for seven billing periods to his local utility AEP Ohio's contemporaneous supply rates.

| Billing Period | Eligo Rate ($/kWh) | AEP Ohio Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/22/22 - 7/22/22 | $0.1890 | $0.0715 | 2.6 | 164% |
| 7/22/22 - 8/22/22 | $0.1890 | $0.0723 | 2.6 | 161% |
| 8/22/22 - 9/21/22 | $0.1890 | $0.0723 | 2.6 | 161% |
| 9/21/22 - 10/20/22 | $0.2105 | $0.0729 | 2.9 | 189% |
| 10/20/22 - 11/18/22 | $0.2072 | $0.0732 | 2.8 | 183% |
| 11/18/22 - 12/21/22 | $0.1990 | $0.0732 | 2.7 | 172% |
| 12/21/22 - 1/24/23 | $0.1990 | $0.0691 | 2.9 | 188% |

68.     The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff's account and AEP Ohio's contemporaneous rates. Eligo's rate was more than *2.6 times* AEP Ohio's rate in *every* billing period. On average, Eligo's rates were ***more than 2.7 times*** AEP Ohio's rates.

69. The local utility's rates are a reasonable, pre-discovery benchmark of a rate that is a "monthly variable rate that may be periodically adjusted to market conditions." As explained above, the local utility is Eligo's primary competitor in Plaintiff's service territory, and the local utility's supply rate reflects the same costs that CRESs like Eligo incur in Ohio. Thus, the utility's rate is an ideal benchmark for a rate that was calculated in accordance with the pricing term in Eligo's customer contract.

70. The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to charge variable rates "based on" the two criteria identified in Eligo's customer contract.

71. Further, that Eligo claims to sell "100% renewable energy (through use of Renewable Energy Certificates) does not account for Eligo's excessive variable energy rates. For example, the cost to purchase renewable energy credits for 100% of the electricity Eligo supplied to Plaintiff would have been, on average, less than four tenths of a penny per kWh— approximately 2% of Eligo's average rate. Indeed, Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and these costs cannot explain Eligo's exorbitant rates.

***Benchmark Three: Eligo's Own Fixed Rates***

72. Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable profit. In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add ***lower*** margins to its variable rates. Yet the opposite is true.

73. That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates were not set in accordance with the representations Eligo made to customers regarding its variable energy rates.

74. There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers. Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different. In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy. The only reason that Eligo's variable rates are so much higher than its fixed rates is that it sets variable rates in transparent violation of its contract's pricing term.

75. Eligo's rates also cannot be explained by the price of renewable energy credits. As noted above, the cost of renewable energy credits do not explain Eligo's excessive variable rates.

## CLASS ACTION ALLEGATIONS

76. Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential and commercial customers in the United States who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment and whose contracts contained the same or equivalent pricing term as Plaintiff's contract (the "Class").

77. As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants. Defendants have engaged in uniform and standardized conduct toward the Class—their contracting and rate-setting practices—and this case is about the responsibility of Defendants for their conduct in calculating customers' variable energy rates.

This conduct did not meaningfully differentiate among individual Class members. Upon information and belief, the variable rate provisions in the customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

78. Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

79. Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files his motion for class certification.

80. Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Eligo. Plaintiff believes, however, that based on the publicly available data concerning Eligo's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

81. The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

82. Plaintiff is an adequate class representative. His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the

Defendants. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

83.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

84.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   Whether Eligo breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract;

      b.   Whether Class Members have been injured by Eligo's conduct; and

      c.   The extent of class-wide injury and the measure of damages for those injuries.

85.     A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

86.     A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

87.     A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any

questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

88.     Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

> a.  Whether Eligo breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract; and
>
> b.  Whether Class Members have been injured by Eligo's conduct.

89.     Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I:
### Breach Of Contract
### (On Behalf Of The Class)

90.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     Eligo customers have customer agreements whose variable rate terms are substantially similar.

92.     Plaintiff and the Class entered into valid contracts with Eligo for the provision of electricity.

93.     Eligo represents in its customer contract that its variable rate for electricity "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."

94.     Upon information and belief, Plaintiff was subject to the same or substantially similar contractual terms as all Class Members.

95.     Pursuant to the contracts, Plaintiff and the Class paid the variable rates Eligo charged for natural gas and electricity.

96.     However, Eligo failed to perform its obligations under its contracts to charge rates in accordance with the formula set forth in its contracts.  Instead, Eligo charged variable rates for natural gas and electricity that were untethered from the formula upon which the parties agreed the rate would be based.

97.     Plaintiff and the Class was damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged a variable rate calculated from the formula identified in Eligo's customer contract.

98.     By reason of the foregoing, Eligo is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

99.     Eligo Energy OH, LLC is not the only Defendant liable for this breach of contract claim.  Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach.  For example, the cover letters sent by Eligo Energy, LLC to Plaintiff and other Class Members state that it would be customers' new energy supplier and that "a copy of the terms and conditions of your agreement with Eligo Energy" are enclosed.

100.    Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the cover letters and contracts, along with identifying itself as customers' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

101.    In addition, Eligo Energy OH, LLC contracted on Eligo Energy, LLC's behalf.

102.    And as alleged above, Eligo Energy OH, LLC is the alter ego of Eligo Energy,

LLC and is thus liable for breaching the contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b)     Find and declare that Defendants have breached their contracts with the Class;

(c)     Render an award of compensatory damages, the precise amount of which is to be determined at trial;

(d)     Render an award of punitive damages;

(e)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(f)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any

issue triable of right.

Dated: January 30, 2025
     Cincinnati, Ohio

**GOLDENBERG SCHNEIDER, L.P.A.**

By:     _/s/ Jeffrey S. Goldenberg_
     Jeffrey S. Goldenberg (0063771)
     4445 Lake Forest Drive, Suite 490
     Cincinnati, Ohio 45242
     Tel: (513) 345-8297
     Fax: (513) 345-8294
     jgoldenberg@gs-legal.com

D. Greg Blankinship*
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jbm@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

*\* Pro Hac Vice Application Forthcoming*